State v. Shoultz.

---

THE STATE, Respondent, v. SHOULTZ, Appellant.

1. S., a cripple, deformed from infancy, was indicted for murder; *held*, that evidence was inadmissible in his behalf to show that by reason of his weak and crippled condition of body he was rendered nervous and peculiarly sensitive to fear from external violence.
2. Where one wilfully shoots and kills another in malice, it is murder in the first degree, and not murder in the second degree.

*Appeal from St. Louis Criminal Court.*

*Cline & Jamison,* for appellant.

I. The evidence offered by defendant was clearly competent and should have been admitted. The condition of Shoultz's mind was an important consideration for the jury in passing upon his guilt or innocence. The evidence shows him to be a weak and crippled boy ; deformed from his infan-

cy ; always sick and often unable to walk or help himself, and of so frail a fabric that an ordinary blow from the fist of the deceased would have been sufficient to take his life. This had a powerful effect upon his mind, and when he saw his hand raised against him, a sense of his own weakness, heightened by the pain of disease, which had preyed upon him from his birth, moved him to do that for his own protection which is now charged to be murder in the first degree. If the defendant really and honestly supposed deceased intended to do him some great personal injury, and that it was about to fall upon him, although he had no reason for thus supposing, yet if he were to show that his belief arose from his peculiar constitution and character, or from nervousness or cowardice caused by his crippled condition, the homicide in that case would not have amounted to murder, but would have been manslaughter in the fourth degree under our statute. (Whart. on Hom. 212–6 ; Whart. Crim. Law, 463, note ; 3 Stew. & Porter, 315.)

II. The fifth instruction given was erroneous. If the jury should believe that deceased and defendant were of equal strength, then the provocation referred to in this instruction would not extenuate the crime to manslaughter. The same principle should apply to cases where parties are equal in strength as where they are unequal. The instruction also cuts off every defence or palliation which might arise either from passion or self-defence, where the defendant was the first trespasser in a difficulty which resulted in death. No declining the combat, no retreating to the wall or ditch, would be sufficient to protect the accused from the penalty of death ; if he commenced the difficulty, it matters not under this instruction how hot the contest may be waged, or how great the peril of the first trespasser might become, yet he is left by this instruction without any means of defence, and can alone seek protection by flight. If the instruction had pursued the language of the law by stating that the provocation must be *sought* by the deceased in order to destroy its legal effect in his defence, then the jury would have understood

its import, and the appellant would have been left without any reasonable objection to its having been given. The sixth and seventh instructions are objectionable for the same reasons.

III. The eleventh is erroneous. This instruction takes from the jury all consideration of murder in the second degree in every case where death ensues from an intentional act of violence, and unless there be a lawful provocation and a heat of passion, or unless it be done in self-defence, the perpetrator is pronounced guilty of murder in the first degree. The cases of the State v. Dunn, 18 Mo. 419; State v. Jennings, 18 Mo. 443, certainly carried the doctrine to its fullest extent. Here a *wilful* act is held to satisfy a statute which requires the killing to be done with deliberation and premeditation. (See Whart. Crim. La, 439; Copeland v. State, 7 Hump. 479; Whart. on Hom. 168.)

IV. The instructions asked by defendant were improperly refused. (See Granger v. The State, 5 Yerg. 459; State v. Scott, 4 Ired. 409; Whart. C. L. 463; 19 Wend. 569; Shorter v. People, 2 Comst. 197.)

*C. G. Mauro*, (circuit attorney,) for respondent, cited Whart. on Hom. 215, 197; People v. Clark, 3 Seld. 393; Beauchamp v. The State, 6 Blackf. 310; Mitchum v. The State, 11 Geor. 628; The State v. Tilley, 3 Ired. 424; People v. Shorter, 4 Barb. S. C. 460; 2 Comst. 193.)

RYLAND, Judge, delivered the opinion of the court.

Israel Shoultz was indicted at the July term, A. D. 1856, of the St. Louis Criminal Court, for the murder of Henry Inkamp. At the January term, 1857, he was tried and convicted of murder in the first degree. He moved for a new trial; his motion was overruled, and he brings the case here by appeal.

The record shows the following statement of the facts of the case: Dr. William Taussig, produced and sworn on the part of the State, deposes and says: I am a physician by profession, and reside in Carondelet, St. Louis county. I know defendant Shoultz—ever since I resided there—and was also

acquainted with Henry Inkamp, the deceased. I was called to see deceased after he was shot; saw a wound on his left side; it was caused by a ball, shot from a gun or pistol, which had passed through his body and came out on his right side, or was protruded through the skin. I took the ball out, and directed some treatment. He died upon Thursday morning from the effect of the shot. I officiated at the post mortem examination. Upon opening the deceased's body, I found that the ball had struck the eighth rib, glanced downward, penetrated the peritoneal coat of the stomach, grazed the walls of the stomach, penetrated the diaphragm, grazed the pleura, pierced the surrounding ligaments of the lungs, and then passed out between the eighth and ninth ribs. This is all I know of the cause. [Cross-examined.] Deceased was a heavy set, strong man; the stoutest man I ever saw. Saw no other wounds upon him except a cut on his right hand; do not know what kind of a cut it was; it was slight however. Shoultz is a cripple; he has the curvature of the spine, and, from his smallness of stature, should suppose he has had it from his infancy.

Dr. Ashbel W. Webster, called and sworn on the part of the State, deposes and says as follows, to-wit: I was called upon to attend deceased. He was at the drinking-house of Stine, in Carondelet; it was some time in the month of ——, 1856; saw a cut on his hand; saw the shot wound spoken of by Dr. Taussig. This caused his death. He died in this county, in Carondelet, next day. I knew nothing more of the matter than what has been spoken of by Dr. Taussig.

Michael Conrad, sworn on the part of the State, deposes and says: I knew defendant and deceased also. I saw deceased the day he was shot. It was sometime in the summer in 1856; do not recollect the month or the day of the month. He was at my house on the day he was shot. He was there about three hours. Defendant was passing in the middle of the street in his buggy. Deceased called him off as he was passing. This was one hour before sundown. Defendant got off of his buggy and came in the bar-room, and

asked deceased what he stopped him for. Deceased asked him, " Do you know of any one who upset my carts and wheelbarrows at the blacksmith's shop on the night of Joseph Shoultz's ball ?" Defendant said, " You might as well accuse me of it, as it took place on the night of the ball." Deceased said he merely wished to know if he knew of any one who did it. They got into a dispute and some high words passed. Defendant said he had something against him (the deceased) anyhow. They talked pretty loud in a quarreling way. The young man wanted to fight the deceased ; and when they got outside they still talked loud, but soon made it up, and came in and took a drink. Defendant did nothing to Inkamp, but he said half a dozen times he wanted to fight him. Deceased said he did not wish to have any thing to do with him ; to keep away from him. They were together about twenty-five minutes ; made friends ; came in ; shook hands, and drank. I think Shoultz paid for the liquor. After this Shoultz started off in his wagon. Deceased was standing in the door or in front of it, on the pavement, when he called Shoultz in. It was done in a friendly way. He was in a laughing way when he spoke to him about upsetting the wagons, &c. Shoultz got mad and said, " You might as well accuse me of doing it." Deceased did not get mad then, nor did he get mad at all. Shoultz remained twenty-five or thirty minutes. I saw deceased on the second night after his being shot. I remained with him until four o'clock in the morning, and was at his funeral. I am not certain that I saw defendant on that evening again. I was not present at the difficulty which resulted in his shooting Inkamp. [Cross-examined by defendant's counsel.] Inkamp did not get mad at all. Shoultz was in the —— and treated. I told Inkamp that he would not shoe his mare because he did not send the money, but that it made no difference as he had sent her to St. Louis —— Gamache to be shod. Deceased called Shoultz off his wagon. He was going past the house in the direction of his home. Deceased was a blacksmith by trade, and a very stout man—more so than any one in this house. He

was not born in this country.   He was not a Frenchman. He was a German.

Charles Ahlig, sworn on the part of the State, says : I was present at the time Inkamp was shot.   It was on the evening of the 9th of June, 1856, at Mr. Stine's bar-room, in Caron-delet.   I went down there at five o'clock P. M., or a little afterwards, with soda, and to make a settlement; saw defen-dant and deceased standing near the counter talking with each other.   I heard some words, but as it did not concern me I paid but little attention to it.   They then came pretty near a fight.   I then stepped up to the bar ; was there five minutes, and Shoultz shot Inkamp.   I heard many words, but have forgotten them.   I heard deceased say it was not right for Shoultz to talk bad of him behind his back ; he was very angry, and would strike his fist on the counter.   I think it was his right hand ; and also said that Shoultz was no American, and had no American-feeling heart.   Shoultz said, " I will show it to you," and so drew a pistol and shot him. I do not know where he got the pistol from, it was drawn so quickly, unless it was in his coat or pants' pocket.   It was pointed at the middle of deceased.   They were not more than three paces apart.   Deceased was standing near the counter; and when he was shot, he turned to it and said, " take me out ; I am shot."   I saw no blood on him.   Shoultz had gone. I do not know where.   When I first went in, deceased was standing in front of the counter and leaning against it.   He had his arm on the counter, and would turn around and strike with one hand on the counter.   Defendant stood in front, face to face.   I saw Shoultz at one time jump towards deceased and call him out to fight; did not notice his hands; do not know how often he came up in this manner.   De-ceased said if he was a man who could fight, he would have fought him long ago.   Deceased continually made motions with his hands.   [Here the circuit attorney offers to read a portion of the examination of witness taken before the com-mitting magistrate, so as to refresh his memory, which was objected to by defendant.   The jury being sent out, the paper

was shown to witness, who states that it was his signature which was appended; that it was his testimony, and that it was read to him at Esquire Poepping's before he signed it. Here the circuit attorney reads the following to him: "He raised up his fist and went up to deceased and used some threatening language." "Do you now recollect this?" "I do." Here the jury were brought back, and the witness is asked to state to the jury what he now recollects after hearing that portion of the testimony read; which is objected to by defendant, and objection overruled and excepted to.] Defendant held his fist up and approached deceased; do not know how near he held it to him. His fist was not in motion, but his body was; don't know what he said. Deceased said, if defendant was able to fight, he would have fought him long ago; that Shoultz was a cripple and could not fight with him; and if he did, he would be ashamed before every body; and, as a gentleman, could not do it. This was a few minutes before he was shot. There were six or seven men in the house at the time. The door was standing full of men. The bar-tender was behind the counter. I finished my business. They took deceased out to a grocery below. It was five o'clock, P. M. All this took place in St. Louis county. [Cross-examined by defendant.] I did not see deceased dash the blood at Shoultz or on him; can't say if Inkamp was drunk or sober. Inkamp did not take hold of Shoultz at the time Shoultz shot. I understand English for all purposes for my business. I am a Hessian; do not know where deceased is from. I spoke in English when I gave my testimony before Esquire Poepping. I did not see deceased break the tumbler. That was before I came in the room. I did not hear bar-keeper order him out of the house; did not see deceased have hold of defendant with his hand raised to strike him. The bar-keeper was busy and could not attend to my accounts. I was not talking to any one. My face was turned towards the bar. Shoultz was about three steps from where deceased was standing. I did not see blood thrown on defendant.

Christian Beck, produced on the part of the State, deposes and says as follows : I am bar-keeper at Mr. Stine's, at Carondelet ; was then acting in that capacity when Inkamp was shot. This took place about six or seven o'clock, P. M., in summer last. Shoultz came in the bar-room first ; was playing cards, and had been there about thirty minutes before deceased came in and took a drink, and then Shoultz came up with his party and drank also. Some one came along with Inkamp ; think it was a wagon-maker. After Shoultz's party had gone out of doors, he went up to deceased to speak friendly with him ; he asked him to treat. Deceased said he would not, but at last agreed to it. Defendant said, " If you treat me, you must treat my friends also ;" to which deceased agreed. They were called in and all drank. Shoultz asked him again to treat ; to which he replied, " I have treated you and your friends, and will not treat no more ;" so defendant treated himself and deceased ; and what took place here—I did not pay particular attention to what they were saying, but they raised a fuss among themselves ; do not know who commenced it. They were standing with their sides to the counter. Deceased said it was not right for defendant to shake hands and then raise a fuss. Shoultz wanted Inkamp to fight him, and jumped at deceased once or twice. Inkamp had a tumbler in his hand, and was going to drink when Shoultz jumped at him. When this was doing, deceased put his glass back on the counter and broke it. I told them both to go out doors and not to raise a fuss in the house. Deceased broke his glass ; do not know what he done this for. Defendant wanted to fight, but deceased pushed him away quite easy, and told him to keep free. Defendant said to deceased, " You shall whip me." Deceased said he did not like to fight him, because he was a cripple. Defendant jumped at him three or four times. I did not see him have his hand up. Inkamp was still at the counter and Shoultz was at him all the time. Deceased said he would not fight him, as he was a man who was not able to take care of himself. This he stated five or six times, and both before

and after he pushed defendant back. They were moving towards the door. Defendant put his hand in his pocket two or three times and pulled it out again. This was about five or ten minutes before the shooting; I heard the shot, and saw defendant pull back his pistol, but was at that moment engaged in putting up the glasses. I did not hear Shoultz say any thing when he shot; but put the pistol in his pocket and walked out the door. Deceased had his hand on the counter at the time he was shot. He put his hand on his side, walked one or two steps towards the door, and then came two men who took him home. I saw him that evening in his own house. He died in two days afterwards; did not see deceased do any thing to defendant all the time he was there. There were many persons there at the time, the most of whom were in the door. I was at deceased's funeral. [Cross-examined by defendant.] · I testified in this case before the justice; he wrote my testimony; do not know that he read it over before I signed the paper. I did not say, as it is stated, that deceased took defendant by the body. Deceased was mad at the time he put the glass down on the counter and broke it. It was after this that he pushed Shoultz away. I was standing at the side of the counter, and did not see deceased throw blood in defendant's face. Defendant had one hand in his pocket and came up against deceased. Deceased was a large stout man. I did not see that deceased was drunk.

Joseph Phiper, on the part of the State, being sworn, deposes and says: I live in Carondelet; was at Stine's grocery at the time deceased was shot last June. When I went in the bar, Shoultz went up two or three times to deceased, who said to him he did not want any thing to do with him. I was there about five minutes; was in the act of turning around to leave when I heard the report of the pistol. When defendant fired the pistol he said, " I have shown you if I have an American heart," and then went out of the front door, got into his buggy and went towards home. It was after Shoultz had shot that he said, " I've shown you if I have got an

American heart." He went before I did. I knew deceased about two months; was at the post mortem examination. [Cross-examined by defendant.] I have been in this country about twelve years, and have lived in Carondelet about eight or nine years. I testified in this cause before the magistrate; spoke in the German language.

Christian Grimm, produced and sworn on the part of the State, deposes and says: I knew deceased and defendant; also recollect the day of the difficulty which resulted in the death of the former. I saw defendant as he drove away from Stine's grocery, and saw the deceased about two minutes after he was shot. Defendant was going towards his house; deceased was on the pavement about thirty steps from Stine's grocery; his partner was conducting him home; saw him the next morning lying on his bed; heard him make no statement. [Cross-examined by defendant.] I knew deceased about eight years, at his machine shop in St. Louis. I saw Shoultz and several persons on the street; saw deceased a few minutes before he was shot; he was talking to his partner; did not hear what he said. I was in the act of going to the brewery; heard no one in the grocery as I passed. I know nothing of the shooting. [Re-examined.] Deceased was standing up and talking with his partner, about four or five o'clock in the afternoon; seemed to be sober; his name was Henry Inkamp. Here the State closed.

Louis Robear, produced and sworn on the part of defendant, deposes and says: I am the partner of deceased, and remember the day on which he was shot. I was in company with the defendant. I went to Michael Conrad's, and got in with the defendant and rode up to Stine's. After we had been there a short time, deceased came in. A few words passed between him and Shoultz. Shoultz said deceased had not shod his mare right. I said it made no difference as he had won the race at any rate. Some words passed about the cart and grindstone. Deceased asked defendant who turned them over. He said that he did not know; that he was not in the habit of turning grindstones over. This was at the

house of Conrad; don't think any hard words passed between them there. We then left with Shoultz and rode up to Stine's grocery. We played a game of cards; had already finished, and were getting up to take a drink, when deceased came in. He was invited by some one to join us. We all drank. I then went out doors. We came back again soon. Defendant and deceased now commenced with high words again about the grindstone business and the horse-shoeing. They went on with the excitement, but I do not know what was said. I stood outside of the door, and could not see all, nor hear what was said. I saw a scuffle going on between them; they were pushing each other at the same time; did not see the shooting; heard the report and saw the smoke of the pistol. I saw defendant come out of the house; saw blood on his face; saw deceased break his tumbler. They were drinking together. Something arose and he smashed it on the counter. [Here the defendant offers to prove the deceased to have been a man of violent temper and quarrelsome habits, and that such was his general reputation among his neighbors; all of which was rejected by the court on the ground that it was irrelevant, to which decision the defendant at the time excepted.] [Cross-examined by the circuit attorney.] I have spoken to several persons about this case; spoke to Primm, Gibau, and several witnesses in the cause. We spoke as to when it would come off—I mean the trial. I went up soon after the difficulty to see Mrs. Shoultz. She sent for me and Mr. Gibau; we went together. She wanted to hear how it was; do not recollect what passed. My memory is pretty good. But few words were spoken; do not know what they were; defendant has a little brother and some sisters; first saw Shoultz at Mr. Conrad's, between five and six o'clock; deceased and a wagon-maker were there; do not recollect whether deceased stopped defendant or not; they had a talk about a former difficulty of shoeing a horse. I was out of doors when they made up; did not see them strike; deceased and defendant drank with others; but did not see them drink alone. I think H. Hook treated, but am

State v. Shoultz.

not certain. Defendant invited me and others to get in and ride in his wagon. He went directly to Stine's. I did not know of defendant's having a pistol. It is near half a mile from Conrad's to Stine's. We were about two or three minutes in going up. Four played for the ————. We then drank ; deceased came in about the time we finished drinking. Some one asked him to drink, which he did. In about five or six minutes defendant asked deceased to treat, which he did, and we all drank. After Shoultz said, " If you treat me, you must treat all of my friends," deceased said, " call them all up." We all went up. I drank, and so did the others of the party. I do not know how long I remained at the bar ; nor did I hear Shoultz ask deceased again to treat. But I saw them again at the far end of the counter ; but do not know who treated. I had not been out of the house after we drank up to this time. I think deceased said it was wrong for defendant to pick a quarrel. I was still in when deceased smashed his tumbler on the counter ; saw them quarreling close to the door ; do not know any of the words that were spoken between them prior to the time the glass was broken ; think I heard the bar-keeper say he did not want any noise in the house. I was not watching them all of the time, but they were jawing and making a noise. I may have looked out of the door at that time ; did not see Shoultz make a motion or want to fight. They were excited, and I think I saw Shoultz go up to have a fight with deceased ; this did not take place more than once. I saw deceased shove him back ; this was done in a pretty rough manner ; and was ten or fifteen minutes before the shooting. He shoved him back after he had broken his tumber, and told him that he was a cripple. Before the tumbler was broken I came in twice, and during the difficulty saw defendant have one of his hands in his pocket, but saw nothing in it. This was eight or ten minutes before the shot. They moved towards the end of the counter, and at the time of the fussing, I heard deceased say to defendant, " You have not got an American heart," or something to that effect. If I un-

derstood him, he said, "I will show you if I have got an American heart." This was about the time he fired, and when he went out, he said, "You will see I have got an American heart," or words to that effect. He got in his buggy and drove off; saw him after about $6\frac{1}{2}$ o'clock, Saturday, at the frame house at the corner; did not see the pistol after the shot was fired. I went home; saw Shoultz at our shop. He was acquainted with deceased. Saw defendant have a pistol before when he came to the ———; think on one occasion he had a revolver.

Bartholomew Gihon, of lawful age, sworn on the part of the defendant, states: I am a resident and native of Carondelet, and recollect the time deceased was shot at Mr. Stine's. I was present; it was in the month of June; and was constructing a house in the lower part of the town; and as I was passing went into the bar-room. Saw Shoultz and several others playing a game of cards. After finishing the game, deceased came in. They all went up to the bar and drank. Several of us went out, and defendant called us in to drink a treat of deceased, which we did, but do not know who paid for it. Defendant asked deceased to treat again, which he declined, and defendant then said he would treat; they went up to the bar and loud words ensued. Defendant asked deceased if he still had harsh feelings towards him about the cart and grindstone. Then deceased turned around to the counter, caught his tumbler, and smashed it to pieces on the counter, leaving the indentation there to this day. Then they had many hard and angry words. Deceased had his hand full of blood, and flung it in defendant's face, and took his hands and pulled his hat by the rim down on his face. Shoultz was pale with fear. Deceased was in a great passion, and made at defendant, who told him to keep off of him, and when he came, defendant shoved him away. The *liar* passed between them. Deceased held his fists up near each ear of defendant, and shook the blood from his hand in his face; then they got to shoving each other, and got up to the front door, which was wide open. I slipped out on the

side-walk and turned and looked in the house ; then Shoultz was to my right and deceased to my left, and facing each other, and both much excited. Then deceased shoved Shoultz with his left hand, and had his right hand raised as if to strike him. Defendant fell back and fired. I could not see him for the door frame. Deceased wheeled round and said, "I am shot ;" and defendant got in his buggy and drove off. Mr. Robear took deceased and started off home. I reside in Carondelet ; am a house carpenter ; am no relation of defendant's. Shoultz is a weak person, and a cripple. Deceased was a stout, robust man, and, in my opinion, could have killed defendant with a single blow of his fist. [Cross-examined by circuit attorney.] He might have struck him before that time if he wished ; deceased pulled his hat by the rim down over his forehead. I have known defendant and his family for ten or twelve years ; am intimately acquainted with them, but had not, to my knowledge, seen Shoultz that day before ; but casually saw him three or four times per week ; saw him once in jail ; had no talk ; several persons were with us at the time ; was there about thirty minutes. I have talked with many persons about it ; have spoken to Robear, but do not recollect what was said. Deceased drank at the bar. I was there about a half an hour or more. I went to the door after we drank ; was engaged in conversation when we were called back by defendant to be treated ; we all went back ; deceased treated, but did not see any one pay for it. We staid a long time after this. About fifteen minutes after this, deceased was again asked to treat by defendant and refused, but defendant said he would treat ; then defendant and deceased drank alone. They soon got to shoving each other ; deceased dashed down his tumbler on the counter and broke it, and cut his hand ; deceased spoke so loud and fast that it was difficult to understand what he said. He spoke of Shoultz upsetting his cart and grindstone. Deceased shoved defendant first, and then defendant shoved him ; they pushed each other four or five times. Robear was there at the time. When deceased hit the counter with the

10—VOL. XXV.

glass, the bar-tender said he had been there two or three times already that day trying to raise a fuss; I did not see defendant make a motion at deceased at the time he broke his glass. I heard deceased say once, " You are a cripple boy and I want nothing from you." I paid but little attention as I supposed deceased would do nothing to so small a crippled boy. Did not hear defendant want deceased to fight but once. He said, " Do you want to fight me ?" to which question deceased said he did not want to fight: " You are a cripple." This was after the tumbler was broken, and after the shoving; when defendant asked deceased about fighting, I had no idea that he wanted to fight; did not see him have his hands in his pocket. I think deceased said something about defendant's having an American heart; did not hear him say, " I have shown him that I have an American heart." I had some talk with the mother of the defendant on the night of this difficulty. She sent for me and wanted to hear how the trouble occurred.

Thomas W. Levant. I am fifty-five years old ; have known defendant from his infancy up to this time. He is about eighteen or nineteen years old ; he has always been a cripple, caused by a curvature of the spinal column. He has always and is at this time weak both in health and in strength. [Question. " Do you know what effect the crippled condition of defendant's body has upon his mind as to rendering him more sensitive to external danger and fear ?" Objected to as irrelevant ; objection sustained by the court, and excepted to by the defendant.] He has always sustained the best of reputation for peace and quietness; is of kind, gentle and amiable disposition ; and has always been a pet in the village. I knew deceased. He was a stout man, and had a most violent temper ; was generally regarded as a quarrelsome man ; do not know that he would inflict great bodily harm or not ; have heard many persons say he was a bad man, unruly in his family, and dangerous when in liquor or was drinking.

Peter D. Barada, sworn for the defendant, deposes and

says : I have lived in Carondelet for thirty-six years ; know defendant.   He is twenty-one years old, and has been a cripple from his infancy.   He has always borne a good character for peace and quietness.   [Question.   Does his crippled condition of body render him more sensitive to fear and danger than he otherwise would be ?   Objected to for incompetency and irrelevancy ; objection sustained by the court, to which decision of the court the defendant at the time excepted. As the testimony of Gihon seemed to have a tendency to establish self-defence, the court was of opinion and decided that defendant might inquire into the character of deceased as a dangerous man, as tending to show reasonable grounds of apprehension, and submitted proof to that end.]   I have known deceased for eighteen months ; he has always borne a bad character for peace and quietness ; and has always been regarded as a bullying and overbearing man; could not say that he was generally reputed to be a man who would commit great bodily harm.   [Cross-examined by attorney for State.]   I have heard persons say that he was generally regarded a dangerous man.   Some persons who have spoken of his character for these things ; one, his associates, or were at the times I heard them speak of him, among whom was Barada, my son.   Never saw deceased more than ten or twelve times, and never saw him guilty of any brutality.

John F. Barada, of lawful age, sworn on the part of the defendant, states : I know defendant, and know that he has always sustained a good reputation for peace and quietness.   Deceased was a quick tempered man ; was passionate, and always sustained a poor character for peace ; he would do harm to any one for slight and trivial provocation.   There is no doubt but that he would cut or stab a man upon slight or trivial provocation.   Such was his general character.   [Cross-examined by attorney for State.   I had a difficulty with him in February or January last.   I went to work for him, and before I found him out thought him to be a very fine man ; have heard some speak well of him, while many have spoken ill of him.

Constance Shoultz, sworn on the part of defendant, states that she is the mother of defendant; saw him on the morning of the difficulty; he went out in the morning to collect money for Mr. Gamache, and came back in the evening with his face full of blood. He is a cripple, and has been ever since he was two months old; is very weak, and is scarcely able to walk; is very sickly, and quite helpless often from his disease of the spine. When he returned that evening he had blood on his hat, face, clothes and shirt; saw no wounds upon him. Do not know where the blood came from. Saw no wounds on him.

Antoine Motear, sworn on the part of the defendant, states that he has known defendant twenty years; he has always sustained a good reputation for peace; deceased was my neighbor, and was regarded as an overbearing man, of violent passions, and was considered dangerous when drunk. [Cross-examined by circuit attorney.] I never heard deceased would stab, cut or kill any one.

David DeLisle, sworn for defendant, deposes and says as follows, to-wit: I know defendant; he has always borne a good name in the town of Carondelet; deceased was of bad reputation for peace; he was often spoken of as a man of revengeful disposition. [Cross-examined by State.] I have heard Motear's people speak of him and others. Here defendant closed.

Edmond Carroll, called and sworn for the State, in rebuttal, deposes and says: I have heard it stated by men who associated with him, that he was quarrelsome. I was present at the time Inkamp was killed. I stood on the step of the door about ten minutes. I was coming from my mother's; heard quarreling going on in the house, and stopped; was not there when deceased broke his tumbler. Deceased was between the end of the counter and the door; do not know what caused him to leave the counter; saw no efforts on his part to strike or hurt Shoultz in any way. Deceased was greatly excited, and was telling defendant to keep away. Deceased may have raised his hand to strike defendant, and

I not have seen it; he might have hit him. There was nothing to prevent him. Defendant was near enough to him. There was nothing to have prevented defendant in getting away. I should say if deceased shoved Shoultz I would have seen it; heard no threats made use of by any one. I was attracted off of the street by the loud talk and quarreling. I heard it some three blocks; only heard deceased's voice. I went immediately to the house, and looked in upon the difficulty; did not look at them at the time of shooting.

Jacob Brough, sworn for the State, deposes and says: I knew deceased before he was shot; we worked together in Messrs. Palm & Robinson's machine shop; he had a good character.

George Fox, sworn for the State, deposes and says: I worked in the same shop with deceased; his character was good.

Mr. Conrad, sworn on the part of the State, deposes and says: I know deceased; have heard some persons say he was a rough and overbearing man; but never knew of any thing wrong of him. [Cross-examined by the defendant.] I know Bartholomew Gihon; his reputation for truth and veracity is good, and I would believe him on his oath.

Frederick Guilford, on the part of the State, sworn, deposes and says: I knew deceased nine or ten years before he went to Carondelet to live; he always bore a good character for peace and quiet.

John Wabe, sworn for State, deposes and says: I knew deceased, and believe that he would not hurt any one.

Henry Gilpin, sworn on the part of the State, deposes and says: I knew deceased about nine years; so far as I know his character is good.

Here the defendant offered evidence in rebuttal. Peter D. Barada, of lawful age, sworn on his oath, deposes and says: I would believe Bartholomew Gihon under oath; no one has a better character than he.

Antoine Motear, sworn, states that he knew Bartholomew

Gihon from his birth ; never heard his reputation impeached for truth and veracity ; no one stands higher in the estimate of the community than he does.

Several other witnesses testified to the same effect as to the reputation of witness Gihon.

This was all the evidence offered on either side. The counsel for the prisoner relies upon the following grounds for a reversal of the judgment: 1st. The refusal of the court below to permit the prisoner to introduce evidence to show that by reason of his weak and crippled condition of body he was rendered nervous and peculiarly sensitive to fear from external violence. 2d. Improper instructions given by the court to the jury on the part of the State. 3d. Proper instructions refused on the part of the prisoner. We will notice these points and give our views concerning them.

It was at one time doubted whether the defendant, in a criminal prosecution, has the right to give in evidence his character. But it may be now considered as settled that the defendant is entitled, in all cases whatever, to introduce evidence of his good character, so far as relates to the subject matter of the prosecution. But his character can only be drawn into issue by himself, and in this he is restricted to the particular trait or quality involved in the prosecution. (Whart. on Hom. 244, 245.) In a trial for murder, " the defendant's peaceableness or regularity of conduct and good feeling towards the deceased would be proper points of defence ; and it would be absurd to divert the issue to other qualities, the *bona fide* possession of which would be perfectly reconcilable with guilt." (Whart. on Hom. 244.) In the case of the State v. Carroll, 3 Humph. 315, the State was permitted to prove the mild and pacific temper and habits of the deceased, for whose murder Carroll was indicted ; and, when this point was insisted on as error in the Supreme Court, that court held that there was nothing in the objection. The court said : " The case depended upon circumstantial evidence, and it was proper to suffer this fact to be proved as a circumstance tending to aid the jury in ascer-

taining the probable grade of the offence. It would have been competent for the prisoner to have made proof, if he could, of a contrary character, independently of the fact that the State made the proof in question." I would not be understood, by quoting this case, to give sanction to its doctrine, but as showing how far some of the courts have gone on this subject. In 1851, at the Stafford summer assizes, Oxford circuit, in the case of the Queen v. Burt et al., 5 Cox Crim. Cas. 284, indictment for stealing from a dwelling-house, it was held that after a witness had given evidence of the prisoner's good character, it was not open to the counsel for the prosecution to give evidence of the prisoner's general bad character. In the trial of the Commonwealth v. Webster, 5 Cush. 324, Shaw, Chief Justice, said: "There are cases of circumstantial evidence where the testimony adduced for and against a prisoner is nearly balanced, in which a good character may be very important to a man's defence. A stranger, for instance, may be placed under circumstances tending to render him suspected of larceny or other lesser crime. He may show that, notwithstanding these suspicious circumstances, he is esteemed to be of a perfectly good character for honesty in the community where he is known, and that may be sufficient to exonerate him. But where it is a question of great and atrocious criminality, the commission of the act is so unusual, so out of the ordinary course of things, and beyond common experience—it is so manifest that the offence, if perpetrated, must have been influenced by motives not frequently operating upon the human mind—that evidence of character, and of a man's habitual conduct under common circumstances, must be considered far inferior to what it is in the instance of accusations of a lower grade. Against facts strongly proved good character can not avail. It is therefore in smaller offences, in such as relate to the actions of daily and common life, as where one is charged with pilfering and stealing, that evidence of a high character for honesty will satisfy a jury that the accused is not likely to yield to so slight a temptation. But still, even with re-

gard to the higher crimes, testimony of good character, though of less avail, is competent evidence to the jury, and a species of evidence which the accused has the right to offer. But it behooves one charged with an atrocious crime, like this of murder, to prove a high character, and by strong evidence to make it counterbalance a strong amount of proof on the part of the prosecution. It is the privilege of the accused to put his character in issue or not. If he does, and offers evidence of good character, then the prosecution may give evidence to rebut and counteract it. But it is not competent for the government to give in proof the bad character of the defendant unless he first opens that line of inquiry by evidence of good character." I have cited these three cases showing how differently the courts of different states have decided on the question of character. I agree with the doctrine laid down by Chief Justice Shaw. The character of the defendant can only be brought before the jury when he opens the line of inquiry himself.

There are cases in which the character of the deceased may be given in evidence. Whenever, from all circumstances in the case, the defendant may have had reason to be in fear of his life, then the character of the deceased for peace and quietness, or for rashness and turbulent violence and disregard of human life, may be offered in evidence by the defendant as one of the circumstances under which his act was committed, in order to show his grounds of apprehension of great personal injury, or of great bodily harm. The defendant has the right of making this proof, not so much on the ground of its being his right to give the general character of the deceased in evidence, as it is that that character is a fact, a circumstance at the time of the commission of the deed which had its weight in the mind of the defendant in producing the defendant's act. But, as a general proposition, the rule continues unbroken that evidence that the deceased was riotous, quarrelsome and savage is inadmissible, even though such knowledge be brought home to the defendant himself. Any other rule would allow a private citizen to take upon

himself the province of government in the punishment of crime. (Whart. on Hom. p. 249.)

So much then for the right to give in evidence the general character of the defendant and of the accused. I have thus mentioned the general doctrine on this subject, but there is no cause for it here; for, as soon as the court saw that the defence might properly turn on the doctrine of self-defence, the defendant was permitted to give the general character of the deceased in evidence. But, the defendant proposed to give in evidence his own peculiar sensitiveness to fear from external force, owing to his condition of body. This the court refused, and we think very properly. Wharton, in his treatise on homicide, lays it down as a general rule that there can not be an acquittal unless there is reasonable evidence of the intent of the part on the deceased to commit some felonious act. This evidence must be gauged by the defendant's opportunities at the time; and if he have reasonable grounds to believe a felony intended, it makes no matter that such was not really the case. Thus if a man assaults another with a pistol in such a manner as to produce the belief that he is about to take life, it makes no matter whether the pistol be loaded or not. (Whart. on Hom. 215.) When, from the nature of the attack, there is reasonable ground to believe that there is a design to destroy his life or to commit any felony upon his person, the killing the assailant will be excusable homicide, although it should afterwards appear that no felony was intended. Wharton says, "it is manifest that very embarrassing questions will here arise as to whether the test to be applied is the defendant's capacity or the capacity of the jury trying the case. If the latter be the case, the question will be of comparatively easy solution. It will be only necessary for the jury to examine the *res gestæ*, and to determine whether, from them, a reasonable belief of an intended felony can be deduced. But if the defendant's capacity is to be taken as the stand point, the inquiry is widely extended. In the first place, it involves the temperament, nervous and intellectual, of the defendant, as well as his means of physical

resistance. In the second place, it involves the same qualities in the deceased, so far as they could have been supposed to have been known to the defendant at the collision. For, adopting this point of view, it would be absurd to say that a child or imbecile person would not have much greater reason to apprehend a felonious assault from an incensed lunatic, who was starting towards him with the appearance of an assailant, than would the lunatic from the attack of the imbecile or child. And if we admit a distinction in this case, it would be difficult to refuse to receive evidence of the nervous and physical texture of the defendant and the deceased in all other cases. It is clear, however, that to do so would be to yield to a very dangerous latitude in the trial of a case, which would not only require a departure from the established common law principle that the deceased's character can not be brought into controversy, but would open a number of complicated side issues." (Whart. on Hom. 215.) "But no danger can be supposed to flow from this principle, when it is considered that the jury who try the case, and not the party killing, are to judge of the reasonable grounds of his apprehension." Such was the language of Justice Parker, in his charge to the jury, in Thomas O'Selfredge's case. From a careful consideration of this point, after a patient examination of numerous authorities, both in England and in this country, we come to the conclusion that the court below very properly refused to admit the evidence of the defendant, that by reason of his weak and crippled condition of body he was rendered nervous and peculiarly sensitive to fear from external violence. In the case of the State v. Merrill, 2 Dev. 279, Judge Ruffin said: " If the best disposed and most pacific man on earth, without provocation (and words are no provocation), assaults another with an instrument likely to produce death, and death ensues, he is guilty of murder. The law infers the malice from the fact. It must be so, else there is no rule, and all is left to the discretion of a jury. The law infers it, because every man of well regulated mind is obliged to say that in every such case the slayer is a man of

dark, malignant heart, of ungovernable passions, regardless of social duty, and bent on spilling human blood. In a case of express malice or provocation, the question is for the jury. They are to determine whether the accused acted on the provocation on the sudden, or had the particular ill-will. But where there has been no provocation, or none shown, the only question for the jury is the credit of the witnesses—the perpetration of the fact." In looking into this case we can not avoid the conclusion that this young man most unnecessarily took the life of Inkamp; that there was no danger of any injury being inflicted on him by Inkamp; and that his efforts to provoke the deceased to attack him or to strike him exhibited a heart regardless of social duty, and of a resolution or determination to use his pistol whenever he thought it might be done without too much danger of the consequences to himself. But his ungovernable passions would not permit him to wait until the deceased should exhibit a disposition to attack him. His efforts to excite Inkamp to some threatening attitude were in vain, and after again and again putting his hand into his pocket and taking it out, as if hesitating, he at length draws his pistol and shoots Inkamp and takes his life. I can not see how the jury could have believed the witnesses and have found any other verdict.

The following is the charge given by the court to the jury: "1. The defendant is charged with murder in the first degree by having wilfully, deliberately and premeditatedly killed Henry Inkamp by shooting him with a pistol. 'Wilfully,' as used here, means intentional, not accidental. 'Deliberately' means a cool state of the blood; that is, not in a heat of passion caused by lawful provocation; and 'premeditation' means thought of beforehand, any length of time however short. 'Malice' signifies such a state of disposition as shows a heart regardless of social duty, and fatally bent on mischief; and 'passion,' sufficient to extenuate homicide, is a heated state of the blood, caused by lawful provocation. 2. Provocation, to be sufficient to mitigate or extenuate homicide, as applicable to this case, should amount to

personal violence or injury to defendant; mere words of reproach, how abusive or grievous soever they may be, are no provocation sufficient to free the party killing from the guilt of murder. 3. If you find that the defendant did wilfully draw a pistol and shoot and kill Inkamp simply because Inkamp used words of reproach towards him, and that he thought of the killing any length of time, however short, before he shot Inkamp, the offence is murder in the first degree, and so you should find. 4. If you find that defendant wilfully drew a pistol and killed deceased on account of any old grudge, as a matter of revenge or retaliation therefor, then the offence is murder in the first degree, and so you should find. 5. If you find that deceased was greatly superior to defendant in physical strength, and struck or rendered him any other personal violence, such violence in the law is a provocation which extenuates the homicide; but if you find that such violence was brought upon defendant by any unlawful act on his part, then said violence constitutes no lawful provocation, and does not extenuate the homicide. 6. If you find that defendant received such violence at the hands of the deceased, without having brought it upon himself by any unlawful act of his, and thereupon, while in a heat of passion caused thereby, he shot and killed deceased without a design to effect death, but in a cruel and unusual manner, the offence is manslaughter in the second degree. 7. If the killing was committed under the circumstances last above stated, but not done in a cruel or unusal manner, then the offence is manslaughter in the third degree. 8. The law of self-defence is emphatically the law of necessity, to which a party may have recourse under certain circumstances to prevent any reasonably apprehended great personal injury which he may have reasonable grounds to believe is about to fall upon him. If you believe that defendant had reasonable cause to apprehend a design on the part of deceased to commit a felony upon defendant, or to do him some great personal injury, and that there was reasonable cause to apprehend immediate danger of such design being carried out, and he shot

and killed deceased to prevent the accomplishment of such apprehended design, then the killing is justified upon the ground of self-defence, and you should acquit.   9. It is not necessary to this defence that the danger should have been real or actual, or that danger should have been impending and immediately about to fall.   If you believe that defendant had reasonable cause to believe these facts, and he shot under such circumstances, as he believed, to prevent such expected harm, then you should acquit.   But before you acquit on the ground of self-defence, you ought to believe that defendant's cause of apprehension was reasonable.   Whether the facts constituting such reasonable cause have been established before you by the evidence, you are to determine; and unless the facts constituting such reasonable cause have been established before you by the evidence in the case, you can not acquit in such case on the ground of self-defence, even though you may believe defendant really thought his cause of apprehension reasonable.   10. And if you find from the evidence that defendant and deceased had a difficulty which resulted in the death of deceased, and that defendant commenced the difficulty or brought it on by any wilful and unlawful act of his, or that he voluntarily and of his own free will and inclination entered into the difficulty, then there is no self-defence in the cause, and you should not acquit on that ground; and in such case it makes no difference how eminent the peril may have been in which defendant was placed during the difficulty.   11. If you find that defendant wilfully killed deceased by shooting him with a pistol, there is no murder in the second degree in the case, but the homicide is murder in the first degree, or manslaughter, or justifiable homicide according to circumstances; that is, if he wilfully shot and killed deceased in malice, it is murder in the first degree; if he shot and killed deceased in a cruel and unusual manner, in a heat of passion, as above described, but without a design to kill, it is manslaughter in the second degree; and if he shot and killed deceased in a heat of passion, without a design to effect death, not in a cruel and un-

usual manner, the offence is manslaughter in the third degree. 12. Good character of defendant, when established, may tend to lessen any probability of guilt which may have been raised against him by the evidence in the cause; but if you are satisfied of the defendant's guilt, you should not acquit, even though you may be satisfied that previously to the alleged homicide he sustained a good character. If you find the defendant guilty of any offence below murder in the first degree, the good character of defendant may properly influence you to assess a lighter punishment against defendant than you otherwise would. 13. If you find defendant guilty of murder in the first degree, you will simply return a verdict stating the fact. 14. If you find him guilty of manslaughter in the second degree, you will assess his punishment by imprisonment in the penitentiary not less than three nor more than five years; and if of manslaughter in the third degree, by like punishment not less than two nor more than three years; or in jail not less than six months, or by fine not less than five hundred dollars, or by both a fine of not less than one hundred dollars and imprisonment in jail not less than three months. 15. If you have any reasonable doubt of defendant's guilt, you should give him the benefit of such doubt, and acquit; but such doubt does not mean a mere possibility of defendant's innocence, but a rational and substantial doubt touching his guilt." To the giving of which defendant excepted.

The instructions given to the jury in every case must be considered by the court in reference to the facts of the case in proof. In this case we have carefully examined the evidence and the instructions, and we consider the instructions given as covering the law of the case; as proper, and tending to assist the jury in forming a right verdict. These instructions laid down the law as favorably as could be required by the defendant. He has no cause to complain that he was prejudiced thereby. In regard to the instructions asked for by the defendant, we consider that the court did not commit error in refusing to give them. The law of the case had been properly laid

down, and although some of the defendant's instructions may be considered as containing correct principles, yet this court will not reverse for refusing to give instructions when the in ferior court has already given sufficient instructions to the jury covering the whole case. What was said by the court in regard to murder in the second degree, we look upon as proper in this case. Here was a deadly weapon ; it was used for the purpose of taking life ; it was calculated for such purpose ; it was used unnecessarily ; it was used deliberately and with- out a lawful provocation. Malice stares a man in the face who examines this whole transaction. As to the instruction in re- gard to the constitution of Missouri, that the people's right to bear arms in defence of themselves can not be questioned, and that no presumption ought to arise in the minds of the jury from the defendant's going armed with a pistol, it could not possibly aid the jury in their deliberations. This right is known to every juryman in our state, but nevertheless the right to bear does not sanction an unlawful use of arms. The right is to bear arms in defence of ourselves. There was no injury to de- fendant by refusing this instruction. We do not consider it necessary to notice the objections made to the refusal to in- struct, and to the instructions given by the court below any more particularly. We are satisfied that the law governing the case was properly declared to the jury ; and that the re- fusal to give the instructions asked for by defendant did not injure him on the trial, or deprive him of any lawful rights in his defence. The number of cases of murder before our court has been unusually great this term. There is a mani- fest indifference to human life which causes deep and pro- found solicitude. The duty of the ministers of justice prompts them to a firm and vigorous administration of the law, and mercy to the public requires that where guilt is manifest, pun- ishment should be certain. " He who wilfully and deliberately does an act which apparently endangers another's life, and thereby occasions his death, shall, unless he clearly prove the contrary, be adjudged to kill him of malice prepense." (East's Pleas of the Crown, ch. 5, § 13.) The doctrine of this court—

as laid down in the cases of the State v. Dunn, 18 Mo. 419, State v. Jennings, 18 Mo. 443, and State v. Hays, 23 Mo. 287, that when it appears from the whole evidence that the crime was at the moment deliberately or intentionally executed, the killing is murder in the first degree—is founded on the proper construction of our statute, and is not repugnant to the doctrine of the common law. This case at bar is not like the case of the State v. Grainger, 5 Yerger, 459. There Grainger used all the means in his power to escape from an overbearing bully. He was shuddering with fear, and his last hope of protection was defeated when Rainey's door continued closed against him, and Rainey did not come to his relief. He shot only to protect his person from threatened violence, and that great. (Judge Catron's opinion, 5 Yerg. 459.) But in this case, I am satisfied Grainger shot without a sufficient provocation, and was not justifiable in so doing; he ought to have been punished at least for manslaughter.

In looking over the case before us, and calmly weighing each circumstance, and giving to each point made the full force which in our opinion it is justly entitled to, we conclude that the judgment below must be affirmed. Our commiseration is alive to the unfortunate prisoner; his youth — his deformity of body — his weakness and sickly habit from his birth up, have all been before us; but the law must be upheld and vindicated. Our duty is a stern and unbending one. We only declare what the law is; we can not alter or modify it. Let the judgment be affirmed; Judge Scott concurring; Judge Leonard absent.