## THE STATE v. J. R. PARMENTER, Appellant.

### Division Two, June 9, 1919.

1. **GENERAL THREAT:** Malice Prepense: Remoteness. A statement by defendant three or four hours before a homicide that he was "going to get a dirty s—— of a b—— tonight," accompanied by an exhibition of cartridges of the calibre of the revolver subsequently used, although not directed towards any particular person, is admissible as tending to show malice prepense; and though its remoteness may affect its probative force, it does not affect its admissibility.

2. **INSTRUCTION:** Police Officer: Self-Defense: Ordering Defendant Off Street. That defendant had been guilty of no conduct authorizing his arrest or being ordered off the street is no defense to the killing of a policeman; and where, by his testimony, defendant shot deceased in self-defense while the latter was making a deadly assault upon him and there was no attempted arrest, no instruction defining the authority of deceased as a police officer or telling the jury that defendant had been guilty of no conduct authorizing his arrest is required.

3. ——: Self-Defense: Good Reason for Believing. To require a jury to find that defendant "believed and had good reason to believe," instead of employing the statutory words (Sec. 4451, R. S. 1909) of "reasonable cause to believe and did believe," that great personal injury at the hands of deceased existed, where the instruction read as a whole demonstrates that it was not

State v. Parmenter.

the real but the apparent danger that would justify action, is not error. Under the facts the meaning of the words "reasonable cause" and "good reason" was the same.

4. ————: Credibility of Witnesses. Where defendant's testimony is directly in conflict with that of the State's witnesses, an instruction as to the credibility of witnesses is authorized.

Appeal from Cape Girardeau Circuit Court.—*Hon E. M. Dearing,* Judge.

AFFIRMED.

*Edward D. Hays* and *Mozley & Woody* for appellant.

(1)  The court permitted Thompson to testify over the objection of defendant and without limiting his testimony, to statements alleged to have been made by defendant in the nature of threats some two or three hours before the tragedy, which statements had no reference to deceased or to any of the officers of the city, or to them as a class. This testimony, if admissible at all, was not admissible as part of the *res gestae,* but only for the purpose of showing general malice, or the disposition on the part of defendant to do some criminal act. This testimony should have been so limited and the jury should have been instructed that it was admitted for that purpose only. This was not done; therefore its admission was error prejudicial to defendant. State v. Crabtree, 111 Mo. 141; Strange v. State, 42 S. W. (Tex.) 551; Melton v. State, 83 S. W. (Tex.) 822; ˙State v. Feeley, 194 Mo. 253; State v. Fletcher, 190 S. W. (Mo.) 320. (2) Deceased was a police officer of the city; as such officer, he ordered defendant off the streets under the penalty of being locked up, or getting hurt, if he did not obey this order. There is no evidence in the record showing, or tending to show, that at any time during the afternoon or evening of the day of the tragedy, defendant had been guilty of any conduct such as would have authorized deceased

to arrest him, or which warranted deceased in ordering him off the street. The court should have instructed the jury, as requested by defendant, that deceased had no power or authority to place defendant under arrest or to molest him, unless defendant had been guilty of such conduct as would amount to a violation of the ordinance of said city, or unless deceased had a warrant for the arrest of defendant. State v. Whitley, 183 S. W. (Mo.) 320; R. S. 1909, secs. 9176, 9180; State ex rel. v. Dierker, 101 Mo. App. 643; Ralls Co. v. Stephens, 104 Mo. App. 120. (3) Instruction numbered six is especially erroneous because it requires the jury to find that defendant had good reason to believe, and did believe, that it was necessary to use his pistol on deceased in the way he did in order to protect himself from great personal injury at the hands of deceased, before they could acquit him on the ground of self defense. Under the law defendant had the right to act upon a reasonable cause, and was not required to have a good reason to apprehend danger to his person. R. S. 1909, sec. 4451; State v. McKenzie, 177 Mo. 714; State v. Gordon, 191 Mo. 122; Stacey v. Emery, 97 U. S. 642, 24 L. Ed. 1035; Claiborne v. Railroad, 46 W. Va. 363; State v. Grant, 79 Mo. 134. (4) There being no conflict of the testimony upon any material point in this case, the giving of instruction numbered nine was error. Since defendant was the only witness who had any interest in the result of the case, the only purpose this instruction served was to single out his testimony and give the jury to understand that the court was of the opinion that he had sworn falsely to some material fact in issue. Keeline v. Sealy, 257 Mo. 498.

*Frank W. McAllister*, Attorney-General, and *Henry B. Hunt*, Assistant Attorney-General, for respondent.

(1) The testimony of Thompson as to the threat made by appellant two or three hours before the shoot-

ing, was properly admitted. State v. Guy, 69 Mo. 434; State v. Harlan, 130 Mo. 390, 394; State v. Fitzgerald, 130 Mo. 425; State v. Cochran, 147 Mo. 517; State v. Feeley, 194 Mo. 313; State v. Mitchell, 204 S. W. 802; State v. Fletcher, 190 S. W. 320; State v. Shoemaker, 183 S. W. 323; State v. Bailey, 190 Mo. 284. (a) The remoteness of threats does not affect their competency as evidence, but goes only to their weight. State v. Whitsett, 232 Mo. 529; State v. Kretschmar, 232 Mo. 29. (b) The question of vagueness of the threats and to whom they referred, is for the jury. State v. Harlan, 130 Mo. 395; State v. Cochran, 147 Mo. 517; State v. Guy, 69 Mo. 434; State v. Fitzgerald, 130 Mo. 425. (c) It is the duty of the trial court to instruct the jury on the essential elements of the crime charged, whether requested or not. Sec. 5231, R. S. 1909; Sec. 5244, R. S. 1909; State v. Conway, 241 Mo. 284; State v. Lackey, 230 Mo. 720; State v. Weinberg, 245 Mo. 575. But it is not essential that the court instruct the jury upon collateral matters unless requested so to do by the accused. State v. Starr, 244 Mo. 183; State v. Conway, 241 Mo. 291. And when a defendant is entitled to an instruction limiting or modifying the effect of evidence, he must prepare and request such instruction. State v. Douglas, 258 Mo. 291. (2) There is no evidence upon which the trial court could have based an instruction regarding the power and authority of peace officers. Sec. 5231, R. S. 1909; State v. Campbell, 210 Mo. 229; State v. Nord, 230 Mo. 659; State v. Chinn, 153 Mo. App. 613. Nor is there any refused instruction on that subject set forth in the bill of exceptions. State v. Johnson, 255 Mo. 287; State v. Gaultney, 242 Mo. 390; State v. Eatherly, 185 Mo. 180. (3) The instruction on self-defense is not erroneous in using the expression "good reason to believe." Sec. 4451, R. S. 1909; State v. Pennington, 146 Mo. 35; State v. Price, 186 Mo. 143; State v. Adler, 146 Mo. 23; State v. Higgerson, 157 Mo. 400; State v. McQuitty, 237 Mo. 236; State v. Miller,

264 Mo. 406; State v. Banks, 258 Mo. 492; State v. Darling, 202 Mo. 161. (4) The instruction on credibility of witnesses was properly given. Robert v. Rialto Bldg. Co., 198 Mo. App. 125; Weller v. Laboratories Incorporation, 197 Mo. App. 61; State v. Barnes, 204 S. W. 269.

WALKER, J.—The defendant was charged by information with murder in the first degree, in having shot and killed Albert E. Demortiers, in the City of Cape Girardeau, October 27, 1917. Upon a trial, he was convicted of murder in the second degree, and his punishment assessed at eighteen years' imprisonment in the Penitentiary. From this judgment he appeals.

About 9:30 p. m., the night of the murder, defendant showed one Thompson four or five 32-caliber revolver cartridges and said he was "going to get a dirty s— of a b— that night." Thompson adjured him to keep out of trouble. Thereafter, at about 11:10 p. m., defendant was seen talking to the deceased, a policeman in uniform, on the corner of Broadway and Sprigg Streets, in Cape Girardeau. The deceased told the defendant if he didn't behave he would have to get off of the street or go home, or he would be locked up. The latter replied that the deceased was a d—— liar and was the same policeman who had run him home from downtown. The deceased turned and laughingly said to a bystander: "He mistakes me for another man." Defendant then went into a near-by saloon, and the deceased went east on Broadway. Ten or fifteen minutes later the defendant and the deceased met in front of another saloon. While the deceased was engaged in conversation with one O'Connell, defendant stepped up behind them and said: "What are you fellows doing out here so late?" Deceased answering him, said: "Dad, you'd better go into the saloon or go home." Deceased then proceeded west on Broadway, followed by the defendant. A few minutes later one Minton, also going west on Broadway, heard a shot

fired. He looked up, and at a distance of about three hundred feet he saw the deceased and the defendant at the corner of Broadway and Middle Streets. The deceased had fallen on the north side of an iron electric light pole. As the witness looked up he saw the defendant step forward, stoop over the prostrate body of the deceased, and shoot him in the right side of the head. The defendant then turned and as he passed Minton, the latter saw the revolver with which he had done the shooting in his hand. There were two other eye-witnesses to the tragedy; a man and a woman, the former being at the time some distance away on Broadway, and the latter near at hand in a second-story room with a window opening on the scene. Their testimony, barring minor differences, was the same as that of Minton. The woman saw the defendant walking towards the scene before he fired the first shot, and after the second she saw him go east on Broadway. No words passed between the deceased and the defendant before the latter fired the shots, and there was no scuffling. After the shooting the defendant was seen to make a throwing motion as if he were casting something away. A young man named Whitelaw, after the defendant's arrest, searched a lot near at hand, in the direction in which the defendant had made the motion, and found a 32-caliber pistol which he gave to an officer. It had five cartridges in the cylinder, two of which had been fired. Shortly after the murder, the defendant was arrested at his home. He denied having been down town that night, and made a like denial at the city jail. On his person were found several 32-caliber cartridges, and an open knife.

The deceased, when examined by those who hurriedly reached the scene, was still breathing, but died in a few minutes thereafter, without regaining consciousness. An examination of his body disclosed two bullet wounds; one had entered the right temple at the hair line, the outer skin around the wound being powder-burned. This wound entered the skull and was fatal.

The other wound entered the neck on the left side and ranged upward.

After defendant's arrest he was taken to the jail. At that time he had no marks or bruises on his person, blood on his clothing, or any evidence of having engaged in an altercation. After being lodged in the jail, the chief of police and three other officers, at about 1:30 a. m., went to the jail building, opened his cell and called to him to come out. He rushed out at the chief, who hit him on the head with a billy. Straightening up from the effect of this blow, he again rushed at the chief, who struck him a second time, from which blow he fell, the blood running down over his clothing. After he fell, the officer struck him several times with the strap end of the billy.

The testimony on behalf of the defendant was substantially as follows:

That his reputation as a law-abiding citizen was good; that on the evening of the killing he went home about ten o'clock p. m.; that about 11 o'clock he went back to town for a walk. After taking a drink at a saloon, he walked out on the street where he saw the deceased and another engaged in conversation, and asked them what they were doing out so late at night. Deceased told him he had better go inside or go home, or he would get hurt. Defendant then started home, going west on Broadway. Deceased stopped the defendant at the corner of Broadway and Middle Streets, where, at the time, the former was standing close to a lamp post. The deceased asked defendant if he had not told him to go home, and defendant said, Yes. Deceased then asked defendant where he was going, and he answered that he was going home. Thereupon the deceased asked the defendant if he had not told him he would get hurt if he did not go home and defendant said: "Who would hurt me?" Deceased replied, "I will," and struck defendant with his fist, and kicked defendant in the groin, knocking his cane out of his hand. Defendant stooped to pick up his cane, and

deceased struck him on the head with his club and knocked him to his knees. Defendant then drew his pistol, which is the last thing he remembers until he found himself in the city jail. It was contended by the defendant that the bruises on his head and the bloody condition of his clothes were the result of injuries inflicted on him by the deceased just before he was shot, and that they were not inflicted by the officers after the homicide, at the jail, as testified to by them.

I. The admission of the testimony of the witness Thompson, of a general threat made by the defendant three or four hours before the homicide, was not error. Evidence of this character is admissible as tending to show the malice prepense of the defendant, although the threat may not be directed against any particular person. We so held in State v. Fletcher, 190 S. W. 1. c. 320, although the threat in that case consisted simply in a declaration by the accused made several hours before the homicide, that "I am going to get him some day." In State v. Feeley, 194 Mo. 1. c. 313, a general declaration made by the accused that "he was a straight shot, and a game man, he," the person addressed, not the one who became the victim, "would find it out," was admitted in evidence to show general malice and a disposition on the part of the accused to commit a crime.

General Threat.

The remoteness of the threat in the case at bar was not a ground for its exclusion. This might, if sufficient time had elapsed between the making of the threat and the commission of the crime, have affected its probative force, but not its admissibility. In State v. Hyder, 258 Mo. 1. c. 230, the threat admitted in evidence was made a year prior to the crime. We, therefore, overrule the contention as to the inadmissibility of the threat.

II. The contention is made that the court erred in not giving an instruction defining the authority of the

deceased as a police officer; that defendant had been
guilty of no conduct authorizing his arrest or
justifying his being ordered off the streets.
Granting this to be true, under the testimony
of the defendant, this constitutes no defense to the
killing. If the defendant is to be believed, as he was
not by the jury, he shot the deceased in self-defense
while the latter was making a deadly assault upon him.
So far, therefore, as the right of the defendant is con-
cerned, it was not material whether the deceased was
an officer or not; besides, there was no evidence of
any attempted arrest. The only fact which even simu-
lates a purpose on the part of the deceased to arrest
the defendant being the former's repeated admonition
to the latter to get off the streets, or he would be locked
up. These admonitions were occasioned by the drunken
condition of the defendant who, the witnesses say, "stag-
gered very much;" but they did not culminate in an
attempt on the part of the deceased to arrest or to
attempt to arrest the defendant. There is no merit in
this contention, and from defendant's own testimony
it may properly be characterized as an afterthought.

Police Officer.

III. Defendant complains of the giving of the fol-
lowing instruction:

"The court instructs the jury that the right of self-
defense is a right not only conceded but guaranteed by
law to every person. So if you find and belive from the
evidence that at the time defendant did
the shooting, if you believe he did, the de-
fendant had cause to believe and did believe it neces-
sary for him to use his pistol on Albert E. Demortiers,
the deceased, in the way he did in order to protect him-
self from some great personal injury at the hands
of deceased, then you must acquit him on the grounds
of self-defense. In such case it is not necessary that
the danger should have been real and about to fall. All
that is necessary is that defendant believed and had
good reason to believe that such danger existed; on

Self-Defense.

the other hand, it is not enough that defendant believed in the existence of such danger, but he also must have had reasonable cause for so believing before he can be acquitted on the grounds of self-defense.''

The phraseology of this instruction is alleged to be erroneous and prejudicial in that it tells the jury that the defendant was justified in acting. defensively if he had ''good reason to believe and did believe'' that it was necessary for him to so act to protect himself from personal injury by the deceased, instead of using the language of the statute (Sec. 4451, R. S. 1909), that he had ''reasonable cause to believe and did believe,'' etc. A distinction is attempted to be made between the use of the words ''good reason'' and ''probable cause,'' as employed in the one instance in the instruction, and the other in the statute, and the aid of lexicographers is invoked to show that the differences in the meaning of these words is sufficient to render the instruction invalid in not correctly defining the defendant's right in this behalf; the burden of this contention being that ''a good reason'' must have a foundation in fact, while a ''reasonable cause'' may rest upon appearances alone. Disconnected from their settings in instructions of this character, a technical support may be evolved for this contention, but it is purely technical. This instruction read as a whole shows clearly that it was not the real, but the apparent danger which would justify defensive action. This being true, the jury could not have been misled as to the defendant's right in this behalf, which, under the facts, was in nowise different than if the words a ''reasonable cause'' had been employed in stead of a ''good reason.''

Neither the McKenzie (177 Mo. l. c. 715) nor the Gordon (191 Mo. l. c. 122) case sustains the defendant's contention. In the McKenzie case the instruction was in the language of the statute, and no question was involved as to the use of other or different terms. In the Gordon case the instruction as construed by the court was so framed as to. impress the jury that be-

fore the accused would invoke the doctrine of self-defense his danger must have been actual or real. The instruction at bar is not, from its terms, subject to this construction. If precedents were needed to sustain the instruction as here given, they are not lacking. In State v. Pennington, 146 Mo. l. c. 35, an instruction almost identical in its terms to that in controversy was held to cover the law on self-defense, and that it was not error to refuse others on this subject asked by the defendant. In State v. Adler, 146 Mo. l. c. 23, an instruction on self-defense followed the language of the statute in employing the words, "had reasonable cause to believe and did believe," etc. In State v. Price, 186 Mo. l. c. 143, an instruction employing the words "had good cause to believe and did believe," etc., was held to be in line with the ruling in this regard in the Adler case, and hence the criticism of same was without merit. In State v. Higgerson, 157 Mo. l. c. 400, the trial court refused to give an instruction asked by defendant which employed the terms "good cause to believe and did believe," etc. We held this ruling to be erroneous, in that the instruction correctly defined the defendant's rights. In State v. Darling, 202 Mo. l. c. 161, the instruction on self-defense was condemned, not because it employed the terms, "had good reason to believe and did believe," etc. (p. 165), but because in other respects it was not couched in such plain and unequivocal language as to be readily understood and comprehended by a jury of ordinary intelligence. In State v. McQuitty, 237 Mo. l. c. 236, the terms "good reason to believe," and "reasonable cause to believe" were both employed in the instruction on self-defense and were held not to be an erroneous departure from the statute. In State v. Miller, 264 Mo. l. c. 406, the ruling in the McQuitty case was approved in this language: "Appellant contends that the instruction for self-defense is erroneous. This instruction contains all the necessary elements to authorize the jury to acquit defendant if they found that the facts presented a case of self-defense. Almost

an exact counterpart of the instruction is to be found in State v. McQuitty, 237 Mo. 232. If other precedents were necessary to sustain the instruction, they may be found in State v. Tooker, 188 Mo. l. c. 446, and State v. McCarver, 194 Mo. l. c. 729, which, while differing in phraseology, contain all the essential elements to be found in the instruction under review and follow a long line of cases on self-defense beginning with State v. Shoultz, 25 Mo. 128. Interpreted according to its own words and context, the instruction under review is not fairly subject to appellant's criticism. It is neither to be read nor construed by piece-meal, ·but altogether. Thus read it is a plain and correct statement of the law in regard to self-defense. We hold, therefore, that the appellant's contention in this regard is without merit."

As sententiously stated by counsel for respondent in the instant case: "If one has good reason to be-lieve he must have a reasonable cause for such belief; and, if he has a reasonable cause for his·belief he must have a good reason for same." Errors must be of hurtful effect to warrant a reversal; we do not so find the one here complained of.

V. The instruction as to the credibility of witnesses is held to have been erroneously given. Its form is not criticised, but it is contended that there was no conflict in the testimony, and hence the instruction was unauthoriz-ed. The transcript discloses that this conclusion is incor· rect. The defendant's testimony was directly in conflict with that of all of the witnesses for the State; and there, was as sharp a conflict between the testimony of the wit-nesses for the State and those of the defendant in regard to the threats of the defendant. The giving of the instruction was, therefore, not error.

This case viewed from that impartial attitude which should characterize a review of the record, discloses no substantial defense. The murder was a ruthless one, and the light sentence given the defendant under the circumstances must be attributed to the ability and

ingenuity of his counsel, rather than any merit in his defense. Finding no error, the judgment is affirmed. It is so ordered. All concur.