# CASES

## ARGUED AND DETERMINED

### IN

# THE SUPREME COURT

### OF

## THE STATE OF MISSOURI,

### MARCH TERM, 1860, AT ST. LOUIS.

[CONTINUED FROM VOL. XXIX.]

---

### THE STATE, Respondent, v. OSTRANDER, Appellant.

1. It is the right and privilege of a jury in a criminal prosecution to determine the facts submitted to them for decision without regard to and uninfluenced by the opinion the judge presiding at the trial may have as to the facts; the judge can not refuse to receive a verdict returned by the jury on the ground that it is manifestly against the evidence.
2. If the verdict returned by a jury in a criminal prosecution be sensible and responsive to the issue, it is the duty of the court to receive it and have it recorded.
3. An affirmative verdict of guilty of murder in the second degree is responsive to an indictment for murder in the first degree; and however strong may be the opinion of the judge that such a verdict is unwarranted by the evidence, and although no instructions whatever may have been given bearing upon the law of murder in the second degree, it would be improper for the judge to refuse to receive such a verdict and order it to be recorded.

*Appeal from St. Louis Criminal Court.*

The defendant, Levi Ostrander, was indicted for the murder of William McCoy. The defendant was put upon his trial upon the indictment, and the trial resulted as set forth

2—VOL. XXX.

below in the opinion of the court. The defendant was after-
wards put upon his trial a second time and convicted of mur-
der in the first degree.

*U. & J. Wright,* for appellant.

I. The court was under a perfect legal obligation to record
the verdict rendered by the jury of murder in the second
degree. (3 Murph. 571; 1 Hayw. 176.) The court illegally
influenced the jury to defeat their verdict. The entire pro-
ceeding of the second trial was against the constitution. The
court erred in refusing a new trial.

*D. C. Woods,* for appellant.

I. The verdict should have been received and recorded.
It was responsive to the issue. (3 Murph. 571; 27 Mo. 380;
22 Mo. 319; 6 Mo. 399.) Where the verdict is merely in-
formal the court may put it in proper form. (13 Mo. 209;
7 Johns. 32; 4 Metc. 354; 9 Dana, 260: 9 Port. 410; 5
Ired. 401: Gilp. 273; 7 Metc. 46.) A new trial will not be
granted because the jury does not find as instructed in the
law by the court. (1 Sm. & M. 400; 7 Leigh, 751; 18 Mo.
419.) A conviction of murder in the second degree necessa-
rily acquits of murder in the first degree. (27 Mo. 327; 28
Mo. 32.) The court improperly polled the jury of its own
motion. (1 Mo. 392; 23 Mo. 579; 2 Gilm. 242; 7 Ired.
27.) "In conclusion, allow me to add that if ever, in the
judicial history of Missouri, the court of last resort should
interpose to save a fellow-creature from an ignominious death,
it is the case at bar. Suffer not the penalty of death to at-
tach to the last finding, for it would be in violation of consti-
tutional right and at war with the great precepts of divine
teaching. The first jury went upon the hypothesis that the
defendant deserved punishment, but not the penalty of death,
for there were many, many palliating circumstances. I re-
gret that the repeated interposition of the lower court shook
to ruins the high purposes and mandates of one who had not
the manly courage and dignity of character to resist the
frowns of the court, after a feeling of consciousness of having

done right to his fellow-man. I hope this honorable court will pardon me for having spoken thus. Nothing but a high sense of duty drives me to the doing of that that the soul would spurn on ordinary occasions. I can not avoid the internal conviction that, if this man is executed, a great wrong will have been perpetrated. Hence I throw myself into the breach to prevent, if possible, the ignominy of such a crime in the ides of the third quarter of the nineteenth century. Duty tells me stop, for justice will be done, and my client saved from a felon's death. Could I leave him to abler hands or hearts more willing to do their fellow-men justice? Hence I relinquish the prisoner to the hands of the court."

*Mauro*, (circuit attorney,) for the State.

I. The first trial was a mistrial. The record shows this and it can not be impeached. The foreman handed a paper purporting to be a verdict to the judge. It was not received however as such. The jury, being sent back with an additional and proper instruction, returned the same paper as a verdict, and being publicly interrogated, one of them dissented. Before a verdict is publicly received and recorded any juror may dissent therefrom. (Lawrence v. Stearns, 11 Pick. 501; 2 J. J. Marsh. 40; Perry v. Mays, 2 Baily, 354; 6 Johns. 68; 6 Dane's Abr. 234.) The court had the power, and it was its duty to direct the jury to reconsider their verdict before it was received in open court and recorded, if convinced that there was a palpable mistake. (8 Bac. Abr. 103, tit. G.; 2 Hale, P. C. 310; 3 Park. C. C. 552; 7 Johns. 32; 2 McCord, 209; 3 Murph. 571; 3 Binn. 514; Dyer, 204; 9 Shepley, 453; 4 Comst. 571.) The court was warranted in the belief that the jury had mistaken their powers and duties. It is the duty of the jury to take the law as propounded by the court. (4 Bac. Abr. 397; 7 Mo. 607; 6 6 Mo. 260; 2 Blach. 151; 2 McCork, 26; 1 Leigh, 588.) Where the evidence leaves no reasonable ground for doubt as to the grade of the offence, the court may direct the jury

to find a general verdict of guilty or not guilty. (17 Georg. 194.) There was but one issue submitted to the jury—guilty or not guilty of murder in the first degree. The subject of murder in the second degree was not discussed by the court; the jury could not consider it. They could not legally know the punishment affixed to the crime, or even its existence in the criminal code. They did not pass upon the issue presented by the court. If the indictment had consisted of several counts charging different offences, and the court had withdrawn from the consideration of the jury all but one count, and the jury, disregarding the action of the court, had found a verdict upon one of the withdrawn counts, certainly the court would be authorized to invite the jury to rectify their mistake before the verdict was assented to and recorded in open court. Such is this case. There was no murder in the second degree in the case. The killing was intentional. (24 Mo. 128.) Had the court instructed upon that degree of homicide, it would have been error. (24 Mo. 475.) There was no lawful provocation; and consequently there was no manslaughter. The pretended verdict never was a verdict. It never did meet with the concurrence of twelve minds.

NAPTON, Judge, delivered the opinion of the court.

The only point arising on this record, which presents any difficulty, is based upon the action of the criminal court upon the verdict, or supposed verdict, of the jury at the first trial. The history of this proceeding will appear from the detailed statement certified by the judge in the bill of exceptions, the material parts of which are here inserted.

"And the jury retired to their room to consider of and concerning their verdict in the premises, and on the following day, the jury in the meanwhile being kept together, came into court, accompanied by the deputy marshal of the county who had in the interim had them in charge, and took their seats in the jury box; and the deputy marshal aforesaid handed to the court the instructions of the court given

to the jury and a paper, which paper is in the words and figures following, to-wit: 'We, the jury, in the case of The State v. Levi Ostrander, find him guilty of murder in the second degree, and assess his punishment to confinement in the state prison for the term of fifteen years. [Signed] D. M. Branch, foreman ;' and the court, having inspected the said paper, handed the same to Mr. Attorney for the State, and to the counsel for the defence for their inspection. And the court then gave the jury the following additional instruction : ' Gentlemen—I instruct you, that if you find the defendant wilfully and intentionally shot and killed deceased with a pistol, there can be no murder in the second degree in the case.' [State v. Phillips & Ross, 24 Mo. 489; State v. Shultz, 25 Mo. 153.] And the court requested the jury to retire and deliberate further of and concerning their verdict in the premises. The defendant objected to the action of the court in sending the jury out again to deliberate upon a verdict they had already rendered, and denied that the jury could find another verdict in the case. Whereupon the jury retired to deliberate further; and after the lapse of some time again returned into court, and the foreman of the jury handed to the court the instructions of the court and the paper above set out signed D. M. Branch, foreman. Whereupon the court asked the jury whether they had yet been able to agree upon a verdict, and the foreman of the jury responded, not otherwise except as they had declared in the paper then held in the hands of the judge, being the paper signed D. M. Branch, foreman. Whereupon the court asked the foreman whether they agreed to render such verdict, referring to the paper signed D. M. Branch, foreman, and the said foreman responded, 'yes.' Whereupon the court told the jury that it was desired by the counsel for the defence, and it would perhaps be more proper, that the verdict should be made responsive to the charge of murder in the first degree, and that their verdict should also declare that they found the defendant not guilty of murder in the first degree, but guilty of murder in the second degree, if such was their

verdict; and, for the purpose of having the verdict conform to the charge, he would ask them if they found the defendant guilty or not guilty of the charge of murder in the first degree; and if they found him not guilty of the offence of murder in the first degree, then whether they found him guilty or not guilty of murder in the second degree; and if they found him guilty of murder in the second degree, would then have the verdict so recorded in due form. And thereupon the court propounded to the foreman of the jury: 'Gentlemen, how say you; is the defendant guilty or not guilty of the charge in the indictment of murder in the first degree?' To which the foreman responded, 'not guilty of murder in the first degree as charged in the indictment.' Whereupon one of the jurymen made a remark: 'That is not my verdict. I am of the opinion that the defendant is guilty of murder in the first degree, but I agreed to the verdict of murder in the second degree as a compromise;' and the court here remarked that it had no right to know, and did not want to know, the motives which had led to the formation of their verdict; what he wished to know, and what he inquired of the jury, was whether they found the defendant not guilty of murder in the first degree, since they had found him guilty only of murder in the second degree; and again asked them: 'Do you find the defendant not guilty of murder in the first degree?' to which the foreman responded, 'yea;' and the other juryman responded, 'nay.' The court informed the jury that the verdict of guilty of murder in the second degree, by necessary implication, found the defendant not guilty of murder in the first degree; [State v. Ball, 27 Mo. 327;] and asked the jury again whether they would find the defendant not guilty of murder in the first degree, and the same result was had as before—the foreman answering, it was the verdict; and the other juryman alluded to, it was not his verdict, and he could not agree to it. Whereupon the court abandoned as a hopeless effort to attempt to obtain from the jury a verdict as to whether defendant was or was not guilty of murder in the first degree, and remarked to the jury that

State v. Ostrander.

if they agreed to render a verdict of murder in the second degree, he would receive it; and. asked the jury if they agreed upon and would render that verdict, and asked the jury: ' Gentlemen, do you find the defendant guilty of murder in the second degree;' and the foreman responded, he could not answer that; the action of the other juryman had placed him in a very absurd position, as that when he wrote and signed that verdict he was authorized so to do for himself and fellows, but that for himself such was his verdict; and the other juryman alluded to remarked that the verdict of guilty of murder in the second degree was not his verdict; and that he did not agree to it, and could not and would not make such a verdict; that he was of opinion that the defendant was guilty of murder in the first degree. And the court, after further conversation with the jury with reference to the necessity of their agreeing to a verdict if possible, and with reference to the probability of their being able to agree upon a verdict, and the court being of opinion that there was no probability of the agreement of the jury, and being assured by divers of the jury that there was an impossibility of the jury's agreeing, and the court so believing, from the matters aforesaid, as well as from the manifest temper of the body, that the jury could not agree upon a verdict on the matter, discharged the jury from a further consideration of the case, and a mistrial was the result."

Our state constitution provides that the right of trial by jury shall remain inviolate, and that, in all criminal prosecutions, the accused has the right to a speedy trial by an impartial jury of the vicinage. This bill of rights, contained in the tenth article of the constitution, declares further that " no person, after having been once acquitted by a jury, can for the same offence be again put in jeopardy of life or limb." In the spirit of these constitutional provisions the legislature has passed laws marking, with great exactness, the line separating the power and duties of the judge from those assigned by the constitution and the laws to the jury. The right of a jury, in a criminal prosecution, to determine the facts, with-

out regard to the views of the judge who presides at and
conducts the trial, is secured by the most stringent enact-
ments.   The judge is confined to an exposition of the law ;
he is not permitted, " on the trial of the issue on any indict-
ment, to sum up or comment upon the evidence, or charge
the jury as to matter of fact, unless requested so to do by the
prosecuting attorney and the defendant or his counsel ;" and
his instructions upon points of law are required to be in
writing.   (R. C. 1855, Practice, art. 6, § 31.)

These constitutional and legislative provisions are man-
ifestly repugnant to some ancient usages, which are said to
have prevailed, to have been tolerated, if not sanctioned, in
the conduct of criminal trials in England.   Bacon says : " It
is said that after a jury have given a verdict of not guilty in
an indictment for felony, the judge may, if the verdict be in
his opinion contrary to clear and full evidence, send them out
again to reconsider their verdict."   (Bac. Abr. tit. Verdict,
G.)   Hawkins says, " It hath been adjudged that if the jury
acquit a prisoner of an indictment of felony against manifest
evidence, the court may, before the verdict is recorded, but
not after, order them to go out again and reconsider the
matter ; but this is by many thought hard, and seems not of
late years to have been so frequently practiced as formerly."
(2 Hawk. P. C. ch. 47, § 11.)

It is scarcely necessary to observe that the power over ver-
dicts attributed by these authors to the judges in England is
not recognized or sanctioned by any law or usage here.   Such
powers as these would be entirely incompatible with that
constitutional protection which a verdict of acquittal gives to
a prisoner.   If the criminal judge may refuse to receive a
verdict in a criminal case because it is manifestly against the
evidence, the judge must, of course and from necessity, be
authorized to determine the questions of fact for himself, so
that his opinion of the facts and not the opinion of the jury
must ultimately prevail.   What becomes of the constitutional
guaranty of a verdict of acquittal, if the judge may refuse to
receive or record the verdict, because in his opinion it is
against evidence ?

Sir Matthew Hale expounds the law somewhat differently from Hawkins and Bacon on this point.  He goes no farther than to say that "if the jurors by mistake or partiality give their verdict in court, yet they may rectify their verdict before it is recorded, or by advice of the court go together again and consider better of it, and alter what they have delivered." (Hale P. C. p. 310.)    And Chitty, following Hale, says, that "if the jury, through partiality or mistake, deliver an improper verdict, the court may, before it is recorded, desire them to reconsider it, and recommend an alteration."    This language is so loose and general that it hardly needs any particular criticism in connection with the particular history of the case we have under consideration.   It is not necessary for us to inquire how far and up to what times mistakes may be corrected by jurors.   These positions of Hale and Chitty are based upon the authority of Plowden, who is also referred to by Bacon and Hawkins.   The case in Plowden (Saunders v. Freeman, Plow. C. 209) is not a criminal proceeding, and therefore has really nothing to do with the principle asserted as applicable to criminal trials.   It was a case where the jury rendered a privy verdict, and afterwards in open court changed it; and the verdict delivered in open court was sustained.   In the course of the decision, it was incidentally said by the court of Crown's Bench that, "even in court, if the jury pronounce a verdict, they may change it, if they have mistaken it, or if it was not full in law, or for any other reasonable cause immediately perceived; for it was said in the Lord Chief Justice Montagu's time, one Archer was arraigned in the King's Bench for felony of the death of a man, and the jury gave their verdict not guilty; and presently after they said they had mistaken themselves, and they said he was guilty; and this last was received and entered as the verdict.   And in 11 Henry 4th, in conspiracy against two, the inquest found one guilty; and it was there said that their verdict was contrary to itself, for a conspiracy can not be but between two at least; and if the one is not guilty, the other is not guilty; for which reason they were sent back and af-

terwards they came again and said that both were guilty, and this was received as their verdict."

Now it is obvious that the instances put by the judges in Plowden, whether they would be allowed in England at this day or not, do not form any precedent for the course of proceeding taken in the criminal court of St. Louis.. Upon the bringing in of the verdict here, there was no suggestion by the jury, or any one of them, that any mistake was made; nor do any of the subsequent developments show that there was any mistake or misunderstanding as to the verdict agreed upon. And in relation to the conspiracy case, the judges said the verdict was " contrary to itself;" that it was contradictory, repugnant, and therefore insensible. One man could not be convicted of conspiracy; therefore the acquittal of one was virtually the acquittal of the other. The verdict we are considering is not subject to any objection like this; but if it was, we are not prepared to say that such a power could be exercised here as was exercised in the conspiracy case in England. Chitty says: " This is considered as bearing too hard on the prisoner, and has been seldom done in modern times, when the decision is in his favor." Chief Justice Taylor, of North Carolina, very properly observes on this conspiracy case cited in Plowden and commented on by Chitty: " Some of the harsh rules of the common law, in relation to criminal trials, have been gradually softened by the improved spirit of the times; and this, among others, is relaxed in modern practice, where the jury bring in a verdict of acquittal. It is considered as bearing too hard on the prisoner and is seldom practiced. I think this course of proceeding is fit to be imitated here, whenever a prisoner, either in terms or effect, is acquitted by the jury, and that in all such cases the verdict should be recorded." (State v. Arrington, 3 Murph. 573.)

The result of the authorities, in modern times at least, seems to be, that, when in a criminal trial a verdict is returned which is sensible and essentially responsive to the issue, the court has no other duty to perform in reference

to its reception except to have it recorded. According to ancient customs in England, and one which prevails in many circuits in this state — a very laudable and safe one — the clerk reads over the verdict to the jury, and calls their attention to it thus: " Gentlemen of the jury, hearken to your verdict while the court records it. You say, &c., &c., and so say you all." This is the time for the correction of mistakes, if any have been made, and this is the mode in which it should be done. (Regina v. Vodden, 6 Cox. C. C. 226; 1 Bennett & Heard, Lea. C. C. 547.)

If these principles be correct, we do not think there can be any question that the criminal court was wrong in giving the instruction which was given after the verdict came in and sending the jury back to reconsider their verdict. We do not speak of the propriety or impropriety of the instruction as an expression of opinion on the part of the court in reference to a point of law; nor do we consider it of any consequence that the opinion of the court upon the facts was right, and that of the jury wrong. We suppose that only one interpretation could be placed upon the instruction, which the court gave after the verdict was rendered, by the jury or by any one else. It was certainly not the enunciation of any new principle of law which had escaped the attention of the court when the instructions applicable to the case generally were given; on the contrary, it was a mere repetition, substantially, if not in precise language, of the law which the court had already declared to the jury. The instruction was intended, we suppose, and must have been so understood by the jury, as an intimation to them that the verdict was not, in the opinion of the court, warranted by the testimony. The language of the court was: " Gentlemen, I instruct you that if you find that the defendant wilfully and intentionally shot and killed the deceased with a pistol, there can be no murder in the second degree in the case." The verdict brought in by the jury was a conviction of murder in the second degree, with a specification of the punishment. The court was of opinion that where the killing was wilful and inten-

tional, the offence would not and could not be murder in the second degree; and as in such cases usually, and in this case particularly, the question of accident or design was not left at all doubtful by the evidence, the court concluded that the verdict was wrong, and therefore called the attention of the jury to it, that they might alter it. We do not consider it important to inquire here whether the court was right or wrong in the conclusions arrived at, either of law or fact; nor whether the result of the action of the court in this particular case did not tend to the administration of justice. We regard it as solely a question of principle—a determination of the true line of demarkation between the court and the jury. As such, it is important; and it would be dangerous and unsafe to allow a departure from fixed principles in criminal trials. Although the result in this case may be, abstractly considered, right; although the prisoner may justly merit the punishment pronounced by the second verdict and final judgment of the court upon that verdict, yet the power exercised here to bring about this result may be exercised in other cases bearing a very different aspect. If the power does not exist, if it is substantially inconsistent with our constitution and laws, it ought not to be exercised in any case. There is no doubt that the verdict was one which was responsive to the issues in the case ; that it was a verdict therefore which the jury were competent to find, and that it was sufficiently formal to authorize a judgment on it, under the repeated decisions of this court. It was a verdict of murder in the second degree, and therefore by implication an acquittal of murder in the first degree. After the court had submitted the verdict to the counsel for the State and for the prisoner and no objections were suggested to it, there remained nothing but to have it read to the jury and ascertain whether it was assented to by all the jurors. In the absence of any dissent, their assent would be presumed and the verdict recorded.

So far, we have considered the case up to the period when the jury retired a second time at the order of the court with

an instruction. The subsequent events of the trial undoubt-
edly present questions of more difficulty. It seems that the
jury returned a second time with the same verdict. At this
stage of the proceedings, the jury were told by the court that
it was desired by the counsel for the defence, and was per-
haps proper, that their verdict should respond formally to the
charge of murder in the first degree ; that it should in terms
declare that they found the prisoner not guilty of murder in
the first degree, but guilty of murder in the second degree if
such was the verdict ; and with a view to ascertain whether
such was their verdict, the court proceeded to ask the jury,
if they found the prisoner guilty or not guilty of murder in
the first degree ? To this interrogatory the foreman re-
sponded, " not guilty of murder in the first degree ;" but one
of the jurymen said that was not his verdict ; that his opin-
ion *then* was that the defendant *was* guilty of murder in the
first degree, and that he had agreed to the verdict originally
found as a compromise. Subsequent conversations between
the court and the jury more clearly showed the dissatis-
faction of the juror with the verdict and the result was a
mistrial.

Had this result occurred immediately upon the bringing in
of the verdict, and upon the interposition of the defendant's
attorney, and without any interference on the part of the
court, the case would have presented a very different appear-
ance. But we must look at the condition of the case as it
stood at the rendition of the verdict. Was the verdict re-
sponsive to the issues, consistent with itself, sensible and
capable of sustaining a judgment ? If it was, why the delay
in recording it ? If the delay in having it recorded, the in-
struction of the court, the remanding of the jury and the
subsequent conversations between the court and the jury
had any influence in shaking the first determination of the
jury, can the result, with any propriety, be regarded as a
mistrial ?

It is obvious that a court, by calling a verdict a paper, can
can not change its real character ; and it would seem to be

equally clear that a verdict, sufficient in itself and acquiesced in by the jury at the time it is rendered, can not be impaired by any delay in having it recorded. The intimation of a court, after the rendition of a verdict, of its impropriety upon the facts in evidence, will have weight with a jury. It is impossible to say that the opinion, evincing a plain dissatisfaction with the verdict, had no influence in producing the vacillation of the juror who ultimately dissented. As we have already said, we do not differ with the court upon the law as declared in the instruction, nor do we deem it necessary to express any dissent from the conclusion on the facts which the criminal court seems to have reached; nor have we any doubt that the object of the court was to promote the ends of justice. The result attained may be more in accordance with the demands of this particular case than could be reached by entering a judgment on the original verdict. But we are of opinion that after the verdict was rendered, the subsequent instruction and remanding of the jury were erroerroneous, and that the error was not cured or waived by the interposition of the defendant's counsel.

We shall, therefore, reverse the judgment and direct the verdict to be recorded. The criminal court will, of course, make the necessary changes in the record to conform it to the facts as certified in the bill of exceptions.

Judge Ewing concurs.

Scott, Judge, is in favor of affirming the judgment of the court below.